UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

*THE MARK LAW FIRM, LLC*
403 King George Road
Suite 201
Basking Ridge, New Jersey 07920
(908) 626-1001
Jamison M. Mark, Attorney ID#: 042392000
Attorney for Plaintiff, Justin Wild

| | |
|---|---|
| **JUSTIN WILD,**<br><br>        Plaintiff,<br><br>v.<br><br>**CARRIAGE FUNERAL HOLDINGS, INC. d/b/a FEENEY FUNERAL HOME; FEENEY FUNERAL HOME, LLC; DAVID B. FEENEY; GINNY SANZO;** and **JOHN** and **JANE DOES 1-10** *(fictitious persons not yet known),*<br><br>        Defendants. | Civil Action No. 2:17 cv 1398<br><br>Hon. Jose L. Linares, USDJ<br>Hon Joseph A. Dickson, USMJ<br><br>Civil Action<br><br>**1st AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff, Justin Wild by and through his attorneys The Mark Law Firm, LLC, by way of Complaint against all Defendants does hereby state:

### PARTIES

1.    **JUSTIN WILD** is a resident of the Borough of Upper Saddle River, Bergen County New Jersey and was at all times relevant an employee of Defendant Feeney Funeral Home.

2.    **CARRIAGE FUNERAL HOLDINGS, INC.** d/b/a Feeney Funeral Home (hereinafter "CFH") operates as a subsidiary of Carriage Services Inc., is a corporate entity, believed to be incorporated in Texas, is the franchise holder of Feeney Funeral Home, and is located at 1900 St. James Place, in Houston, Texas.

3. **FEENEY FUNERAL HOME,** was Plaintiff's employer, and during all times relevant was operating and doing business at 232 Franklin Avenue, Ridgewood, New Jersey, located in Bergen County.

4. **DAVID B. FEENEY**, in his individual and professional capacity, is a citizen of the State of New Jersey, and is the managing director, supervisor and employer of Plaintiff Justin Wild at Feeney Funeral Home. Mr. Feeney terminated Plaintiff, and/or defamed Mr. Wild, and interfered with Mr. Wild's livelihood.

5. **GINNY SANZO**, in her individual and professional capacity, is a citizen of the State of New Jersey, during all times relevant, was the acting director of and employer of Plaintiff Justin Wild at Feeney Funeral Home, and/or defamed Mr. Wild, and interfered with Mr. Wild's livelihood.

6. John Does 1-5 are individual persons who are unknown but had authority, control and/or engaged in conduct to discriminate directly or indirectly against Mr. Wild due to his disability, terminating his employment.

7. John Does 6-10 are those who have defamed Mr. Wild and/or tortuously interfered with his prospective employment by falsely stating that Mr. Wild is a drug addict and/or was under the influence of drugs and cause the auto accident of May 23, 2016.

## VENUE

8. The matter was initially venued properly in Bergen County, Superior Court Law Division pursuant to New Jersey Civil Rule 4:3-2(a), because the Plaintiff was employed and the cause of action arose in Bergen County.

9. Defendant David B. Feeney, is reasonably believed to be a citizen of Ridgewood, Bergen County, New Jersey, as is Plaintiff Justin Wild.

10. On or about 2017 Defendants removed the matter to United States District Court, District of New Jersey pursuant to 28 U.S.C. §§ 1441 and 1332.

11. Venue was improperly removed from Bergen County, Superior Court Law Division pursuant to New Jersey Civil Rule 4:3-2(a), because the Plaintiff is a citizen of, was employed in and the cause of action arose in Bergen County, and Defendants Feeney Funeral Home, David Feeney and Ginny Sanzo are named Defendants with citizenship in the State of New Jersey.

12. Additionally, Defendants who are believed to have directly committed acts in violation of the NJLAD and/or in concert with Defendants Carriage House, Feeney Funeral Home, David Feeney and Ginny Sanzo have been identified as "John Does" as their identity has not been discovered as of this date.

## FACTS

13. In or about 2013, Mr. Wild began working at Carriage Services d/b/a Feeney Funeral Home as a licensed funeral director.

14. Mr. Wild worked 28-30 hours per week, on a per-service fee arrangement, and performed many services for Feeney Funeral Home, including directing funerals, visitations, performing embalming and "cosmetize," removals and airport pickups, dress and casket, preparing death certificates, conducting religious services at grave sites, and driving the Feeney hearse and flower car.

15. In or about 2015, Mr. Wild was diagnosed with cancer.

16. He ultimately had a tumor removed in May 2015.

17. Ultimately, it was believed that another mass was discovered on Mr. Wild's spine in or about September 2015, which at the time resulted in muscle spasms, nerve pain, and neuropathy resulting in servere back pain.

18. As a part of Mr. Wild's medical treatment, and for pain management, he was prescribed medicinal marijuana pursuant to the New Jersey Compassionate Use of Medical Marijuana Act, N.J.S.A. 24:6I-1.

19. Mr. Wild only uses the prescription at night after work to help sleep and ease his back pain and has never during work hours. He does not use his prescription every day, but only when his pain flairs up.

20. On or about May 23, 2016, Mr. Wild, while working a funeral, was in a motor vehicle accident at approximately 11:00 AM, wherein he was without warning, hit from the side by another vehicle.

21. The accident was determined to not be Mr. Wild's fault, as the other party travelled through a stop sign, crossing two lanes of road before blindsiding Mr. Wild who was driving the flower car heading to the cemetery to conduct a burial.

22. Furthermore, while he was at the scene, Mr. Wild contacted the police who investigated the accident. Justin Wild also contacted his father, Bruce Wild, who also arrived at the scene of the accident.

23. The May 23, 2016 an accident resulted in additional injury to Mr. Wild's spine, his left side and stomach pain were exacerbated from Mr. Wild's prior surgery and tumor removal.

24. Mr. Wild was never, and has never been, under the influence of marijuana while at work and performing any of his work responsibilities, nor does his prescribed medication, including the medicinal marijuana, affect his ability to perform his job.

25. After the investigation was complete, the police did not issue Mr. Wild a summons for Driving Under the Influence, N.J.S.A. 39:4-50, which if found guilty, would be a violation of

not only the NJ Motor Vehicle laws, but also a violation of the protections afforded pursuant to New Jersey Compassionate Use of Medical Marijuana Act, N.J.S.A. 24:61-1.

26. Mr. Wild was transported via ambulance to the emergency room, at which time he disclosed his medicinal marijuana prescription and showed his license in response to "Medical History" questions asked of him by the hospital's doctor.

27. The hospital's doctor advised Mr. Wild that it was clear he was not under the influence of marijuana, and therefore no blood tests were required of Mr. Wild.

28. Additionally, while at the hospital, and part of his medical treatment, Mr. Wild was advised by the hospital's doctor to return home, relax, and take his prescribed pain medication.

29. After the accident, Mr. Wild returned home, relaxed and only then took not only the prescribed pain medication, but also the medicinal marijuana.

30. While Justin Wild slept, his father, Bruce Wild, took Justin Wild's prescription and license to Feeney Funeral so that Mr. Feeney would have copy of same. When Bruce Wild arrived at the Funeral Home, Mr. Feeney, Mr. Wild's supervisor, and Norma Van Zile were at the funeral home to greet him.

31. Van Zile made a copy of Justin Wild's paper work, and Bruce Wild advised that the emergency room doctor had refused to perform a blood test on his son because "he would not be liable for forcing a blood test," and knowing that Justin had a legal prescription and was permitted to use marijuana, "of course it will be in his system."

32. Bruce Wild also mentioned to Mr. Feeney that the doctor stated he did not feel that Justin was under the influence of any alcohol or drugs when he was brought in to the hospital, and there was no need for a drug test.

33. Bruce Wild returned home, and an hour or so later, while Mr. Wild was at home recovering from his injury, David Feeney and Norma Van Zile called Mr. Wild's home to speak to Mr. Wild looking for an update on Mr. Wild's ability to return to work.

34. When the call from Mr. Feeney came in, due to the pain Mr. Wild was sleeping, and therefore Bruce Wild again spoke to Mr. Feeney.

35. During the call, Mr. Feeney advised Bruce Wild that he [Mr. Feeney] did not care what the doctor said, and that Justin needed to go to urgent care for a blood test. In reply, Bruce Wild advised that his son was in no condition to do so. Mr. Feeney stated that if Justin did not report back to the hospital for a drug test, he would be terminated on the spot.

36. Bruce Wild advised Mr. Feeney that "Justin was not under the influence at time of accident and the hospital determined he was not under the influence."

37. Bruce Wild again stated to Mr. Feeney that "the doctor in the hospital would not participate in any type of blood testing because Justin's drug test ("medical marijuana and opioids") would test positive because the marijuana stays in one's system for 45 days."

38. Bruce Wild reminded Mr. Feeney that Justin had taken pain medication and medical marijuana, which were legal for Justin Wild because of his license and because they were medically prescribed, and there was no way he could pass a blood test.

39. Is response, again, Mr. Feeney stated he did not want to discuss it anymore, and that Justin had to go for the test.

40. Almost 2 ½ hours later, but almost 6 ½ hours after the accident, on May 23, 2016 at approximately 6:15 PM, Mr. Wild went to UrgentCare to be tested pursuant to a "post-accident," requirement, and not because of "reasonable suspicion" of illegal drug use.

41. While at the UrgentCare, Mr. Wild showed the doctor his license for the medicinal marijuana use and paper work and the prescription medication. The UrgentCare doctor advised that he would not perform a blood test of Mr. Wild because he too did not want to be liable for a blood test result.

42. As such, the UrgentCare doctor actually went and called Carriage Funeral Holdings headquarters in Texas to determine which test to administer, because, as the doctor put it to Mr. Wild: "*I don't want to be part of the test or be involved in a lawsuit due to the test results.*"

43. The UrgentCare doctor's stated that it was his opinion that testing Mr. Wild was illegal, and he warned that the results would be positive due to the marijuana and the prescription pain killers taken after the accident.

44. In lieu of blood testing, the UrgentCare doctor thereafter had Mr. Wild submit to a urine and breathalyzer test.

45. The next day, while still employed by Feeney Funeral Home, Mr. Wild returned to Feeney Funeral Home (not to work) because a close friend's family member had died. While at Feeney Funeral Home, Mr. Feeney and Mr. Wild spoke briefly about Mr. Wild's job, and Mr. Feeney stated that he had not heard anything yet [from corporate].

46. During a conversation on May 24, 2017, Mr. Wild again showed Mr. Feeney the prescriptions, and Mr. Feeney stated "*I don't know what Carriage was going to do or what they'll say,*" and "*I think everything should be fine*" and "*You have a legal prescription here, I don't see a problem with it, you should be fine.*"

47. Mr. Feeney stated that he was not sure what to do, that "*corporate had never had to deal with something like this because the laws are changing*" and that he would talk to him later.

48. During the conversation, Mr. Feeney asked Mr. Wild, "*So how do you use it?*" Mr. Wild stated "*When you go home, you have a drink or a cocktail. I eat it, or that is how the doctors tell me to take it, or you can smoke it.*" Mr. Wild assured Mr. Feeney, "*I only take it when I am home, not at work because I don't want to jeopardize my license for what I have worked so hard for.*"

49. Mr. Wild also told Mr. Feeney that if he did not take the pain medications that he would have severe pain through the day. Mr. Feeney stated that he understood. Again, Mr. Wild stated that he wouldn't jeopardize his funeral directors license and do something stupid, "I follow the law."

50. Mr. Feeney told Mr. Wild to "*Go home, and get better,*" and that Mr. Wild would be on the calendar for a funeral on Friday. Mr. Feeney advised Mr. Wild that to "accommodate" him, Mr. Feeney would have another director there to assist him.

51. Mr. Feeney also told Mr. Wild that he would not be able to "embalm" because he would be seen as a liability, but that he would have a driver for him, since he had the accident.

52. The night before Mr. Wild was to work, Mr. Feeney contacted Mr. Wild and confirmed that he had another Funeral Director to assist him, and to make sure Mr. Wild would be able to come in to work.

53. Mr. Wild came in on Friday as scheduled, and worked as a Funeral Director for approximately four (4) hours.

54. After the funeral, Mr. Feeney called Mr. Wild to follow-up on the funeral, how Mr. Wild did, and at which point Mr. Wild stated that he was very sore, and was going to go home and recover. Mr. Feeney replied and said to Mr. Wild that it was a good idea and to go home and rest.

8

55. Mr. Wild thanked Mr. Feeney for the helping him that day, and bringing in the other director to assist him, and without it, knowing that Mr. Wild had a bad back and was in a lot of pain, he probably couldn't have completed the day. The conversation ended.

56. A few days later, in early June, Mr. Feeney told Mr. Wild that "corporate" [Carriage Funeral Holdings] was unable to handle the marijuana use, and "You are being terminated because they found drugs in your system."

57. Mr. Feeney stated to Mr. Wild that he would have Corporate send Mr. Wild a "letter" explaining everything. Mr. Feeney also explained that he had called Ms. Sanzo to tell her that Mr. Wild had been terminated because of "drugs."

58. Mr. Wild was advised in a letter from corporate that he had been terminated due to his violation of a company policy.

59. Mr. Wild was never given a copy or notified of his urine or breath test results from the lab or CFH.

60. At no time did Mr. Feeney sit down and speak to Mr. Wild about the marijuana use to determine if it was truly a violation of the "policy" and what accommodation could be given, if any, to Mr. Wild due to his cancer and pain management treatment.

61. Mr. Wild's prescription in no way affects his ability to perform his assigned duties as he does not work while under the influence of the medicinal marijuana.

62. Mr. Wild satisfactorily performed the essential function of his job without issue prior to his termination, and had been groomed for greater responsibilities.

63. There have been other employees at Feeney who were suffering from disabilities and required to take medication to help them cope with pain and their disability, such as:

- AA who was diagnosed with cancer and taking medication while performing his duties at the Feeney Funeral Home. AA took medication through a port while working at Feeney.
- AC, who was diagnosed with cancer and taking medication while working.
- JH, who was suffering from cancer and took medication on daily basis, while at Feeney Funeral Home. JH was injured at work, taken to the hospital, took a blood test, failed, and was not terminated.

64. AA, AC and JC were openly using "controlled" substances at work due to their illnesses, one was even injured at work, and none were required to undergo a "drug test," nor were any terminated.

65. Mr. Wild was forced to undergo a drug test despite no evidence that while working on May 23, 2016 he was under the influence of drugs or alcohol, whereas others have not, or were not terminated.

66. Mr. Wild was subsequently terminated for allegedly violating Carriage Services' Drug and Alcohol Policy because, according to the policy: "employees must advise their immediate supervisor if they are taking any medication that may adversely affect their ability to perform assigned duties safely."

67. Pursuant to the Policy, Mr. Wild was not required to notify his employer of his medication as it did not "adversely affect" his ability to perform his job responsibilities.

68. Furthermore, Plaintiff was terminated due to his disability, or in the alternative, due to Corporate CFH, Feeney Funeral Home, and the individually named defendants illegal belief that Mr. Wild's disability "may" adversely affect his ability to perform his job responsibilities.

69. Nonetheless, Mr. Wild was never spoken to by any of the Defendants to determine if, with an accommodation, Plaintiff was able to continue to perform his job responsibilities with accommodations, such as an assistant, or by performing one of the many responsibilities Mr. Wild had performed in the past.

70. After Mr. Wild had been terminated from Feeney Funeral Home, on or about August 15th or 16th 2016, his mother received a call from Tracey Zbierski from Vander Plate Funeral home, who stated that Justin was fired because he is a "drug addict." When Mr. Wild's mother asked Ms. Zbeirski what she meant, Ms. Zbierski stated that she called Feeney Funeral Home, and they told had told her that Justin had been fired for being a drug addict, and Ms. Zbeirski also stated that it ["drug addict"] was a rumor going around at the Bergen County Funeral Directors' Association meeting.

71. According to Ms. Zbierski, she also stated that many people at the Bergen County Director's meeting were also discussing that Mr. Wild was terminated for his drug use while at Feeney, was "under the influence of drugs" when the car accident occurred, and the accident happened because Justin was "on drugs."

72. Mr. Wild has been the subject of repeated comments, embarrassed, scrutinize ridiculed, and rejected from prospective employment because members of Feeney have intentionally smeared Mr. Wild's name to others, including those in the industry, that Mr. Wild was allegedly a "drug addict" and was "using while working at Feeney."

73. These statements made by Feeney employees Mr. Feeney and/or Ms. Van Zilt are patently false, have harmed Mr. Wild's reputation and has interfered with Mr. Wild's efforts to obtain post termination employment.

74. During Plaintiff's employment, he was an exceptional employee, with absolutely no discipline, or notice of corrective action.

75. Plaintiff was terminated by Feeney Funeral Home and CFH. After Plaintiff's termination, members of the Feeney Funeral Home, John Does, notified others in the industry that Mr. Wild was a "drug addict" and "due to drugs, had been in an auto accident."

76. The intentional and malicious comments made by members of Feeney Funeral Home, John Does, were made to intentionally malign Plaintiff's reputation, and harm his ability to secure gainful employment.

77. It was reasonably foreseeable that the comments made by Feeney Funeral Home, John Does, were made to interfere with Plaintiff's ability to secure employment.

78. As a direct result, foreseeably, Plaintiff suffered damages and was denied future opportunity for employment.

## COUNT I

### (New Jersey Law Against Discrimination, N.J.S.A. 10:15-1 et seq. – Disability Discrimination)

79. Plaintiff repeats and realleges paragraphs 1 through 78 of this Complaint.

80. Plaintiff was disabled as defined in the New Jersey Law Against Discrimination N.J.S.A. 10:5-1 et seq.

81. Defendant treated Plaintiff in a discriminatory manner due to Plaintiff's disability.

82. Defendant terminated Plaintiff due to his disability and off work use of prescribed medical treatment.

83. Plaintiff's termination, an adverse act, was committed by the Defendant Carriage Services' upper management and/or supervisors.

84. Although the Defendant knew or should have known of the discrimination suffered, Defendant failed to take any corrective measures to stop or prevent the discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:15-1, et seq.

85. These illegal actions were committed against Plaintiff and the conduct complained of would not have occurred but for Plaintiff's disability. Defendants have engaged in behavior

that violates the New Jersey Law Against Discrimination, N.J.S.A. 10:15-1, et seq, and have thereby irreparably injured Plaintiff.

## COUNT II

### *(Aiding and Abetting – John Does)*

86. Plaintiff repeats and reasserts all allegations above as if fully set forth in paragraphs 1 through 85 of this Complaint.

87. Defendants John and Jane Does 1-10 wrongfully aided and abetted each other, including Defendant David Feeney, as well as unnamed colleagues, managers, supervisors and owners of Defendant Feeney Funeral Home and Carriage Funeral Home in their concerted unlawful, discriminatory treatment of Plaintiff, each actions, as identified herein, in violation of the New Jersey Law Against Discrimination N.J.S.A. 10:5-1, et seq. and all for all causes of action and actions herein.

88. Defendant Feeney, who terminated Plaintiff's employment, did so with the tacit approval of, in conjunction with, at the behest of, and as instructed by employees of Feeney Funeral Home and/or Carriage Funeral Home, whose names at this time are unknow.

89. Defendant Feeney's conduct had the tacit approval of Defendants Feeney Funeral Home and/or Carriage Funeral Home's upper-management, including the conduct of unknown persons located in Houston Texas facility, but those persons' names have yet to be discovered.

90. The covert and concerted actions of Mr. Feeney with the tacit approval of, in conjunction with, at the behest of, and as instructed by employees of Feeney Funeral Home and/or Carriage Funeral Home, whose names at this time are unknow resulted in the failure to accommodate, disability discrimination, perceived disability discrimination, and the illegal termination of Plaintiff due to his disabilities, known and perceived.

91. Because of the collective acts of each Defendant, known and unknown, in conjunction with Defendant Feeney, and due to their concerted plan, scheme and motives to treat and ultimately terminate Plaintiff's employment, in an unlawfully discriminatory manner, Defendant Feeney Funeral Home and Carriage Funeral Services' Upper-Management, Supervisors and ownership, in conjunction with David Feeney, and other employees whose names are unknown at this junction, and until discovery has been completed, did wrongfully aided and abetted one another.

92. As a result of all Defendants unlawful conduct, Plaintiff suffered emotional distress, anxiety, and depression, humiliation and embarrassment.

### COUNT III

*(Defamation – Ginny Sanzo & David Feeney)*

93. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 92 above and incorporates them as if fully set forth herein.

94. Defendant Carriage Services' employees and agents, Defendant David Feeney and Defendant Ginny Sanzo, and John and Jane Does 1-10, falsely informed members of the Bergen County Funeral Directors Association that Plaintiff was a "drug addict" who was terminated because he was "under the influence of drugs" at the time of his car accident.

95. These statements are false and only made to harm Plaintiff's reputation.

96. The defamatory statements about Plaintiff were false in that Plaintiff is not a drug addict, was not under the influence of any drugs at the time of his accident and was not terminated for being under the influence of drugs at the time of the car accident.

97. Defendant's agents and employees made the false and defamatory statements of fact with actual knowledge that the statements were false and with the sole and express purpose of

damaging Plaintiff's ability to obtain comparable employment and reputation within the Funeral Home community.

98. Plaintiff has been injured by the defamatory statements, as they have caused damage to Plaintiff's professional reputation, business relationships, business goodwill and standing in the community.

## COUNT IV

### (Intentional Interference with Prospective Economic Gains)
### (Feeney Funeral Home/John Does, Ginny Sanzo and David Feeney)

99. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 98 above and incorporates them as if fully set forth herein.

100. During Plaintiff's employment, he was an exceptional employee, with absolutely no discipline, or notice of corrective action.

101. Plaintiff was terminated by Feeney Funeral Home and CFH.

102. After Plaintiff's termination, members of the Feeney Funeral Home, John Does, Ginny Sanzo and David Feeney notified others in the industry that Mr. Wild was a "drug addict" and "due to drugs, had been in an auto accident."

103. The intentional and malicious comments made by members of Feeney Funeral Home, John Does, were made to intentionally malign Plaintiff's reputation, and harm his ability to secure gainful employment.

104. Plaintiff has submitted several applications and resumes, talking to other funeral homes, who have denied Plaintiff employment because they were aware that Mr. Wild was a "drug addict."

105. Such comments identified above, are consistent with those alleged as part of Plaintiff's defamation claim.

15

106. It was reasonably foreseeable that the comments made by Feeney Funeral Home, John Does, Ginny Sanzo and David Feeney were made to interfere with Plaintiff's ability to secure employment.

107. As a direct result, foreseeably, Plaintiff suffered damages and was denied future opportunity for employment.

**WHEREFORE**, Plaintiff demands judgment as to all claims, counts and parties, as follows:

    A.)    Declaratory and Injunctive Relief;
    B.)    Compensatory Damages;
    C.)    Loss of pension, health insurance and other benefits,
    D.)    Emotional distress, pain and suffering;
    E.)    Back Pay and Future Pay;
    F.)    Pre and Post Judgment Interest;
    G.)    Liquidated Damages
    H.)    Gross Tax Up Consequences;
    I.)    Punitive Damages;
    J.)    Attorney's Fees and Costs of this Action;
    K.)    Other Equitable Relief; and
    L.)    Such further relief as the Court deems necessary and property in the public interest

*The MARK LAW FIRM, LLC*
403 King George Road, Suite 201
Basking Ridge, New Jersey 07920
(908) 626 -1001 – Telephone
(908) 344 -5544 – Facsimile
Attorneys for Plaintiff, Justin Wild

Dated: 11/2/17

_____
Jamison M. Mark, Esq.
jmark@newjerseyattorneys.com

### DESIGNATION OF TRIAL COUNSEL

Trial Counsel is hereby designated as Jamison M. Mark, Esq.

*The MARK LAW FIRM, LLC*
403 King George Road, Suite 201
Basking Ridge, New Jersey 07920
(908) 626 -1001 - Telephone
(908) 344 -5544 – Facsimile
Attorneys for Plaintiff, Justin Wild

Dated: 11/2/17

_____
Jamison M. Mark, Esq.
jmark@newjerseyattorneys.com

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands, pursuant to Fed. R. Civ. P. 38., trial by jury of all issues triable by jury.

*The MARK LAW FIRM, LLC*
403 King George Road, Suite 201
Basking Ridge, New Jersey 07920
(908) 626 -1001 - Telephone
(908) 344 -5544 – Facsimile

Attorneys for Plaintiff, Justin Wild

Dated: 11/2/17

_____
Jamison M. Mark, Esq.
jmark@newjerseyattorneys.com